IN THE UNITED STATES DISTRICT COURT
STATE OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| PLAINTIFF<br><br>Stephanie R. Bear,<br><br>vs.<br><br>DEFENDANTS<br><br>Twinwolf Express LLC and Brandon A. Darius, | Civil Action No. 3:23-cv- 5191<br><br><br><br><br><br>**COMPLAINT**<br>**JURY DEMAND** |

The Plaintiff, Stephanie R. Bear ("Plaintiff") would respectfully show unto this Honorable Court the following:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Bear is a citizens and resident of Aiken County, South Carolina.

2.      Plaintiff Bear is Active Guard Reserve for the South Carolina National Guard with 17 years experience and is ranked as an O-4 Major.

3.      Upon information and belief, Defendant Twinwolf Express LLC ("TWINWOLF EXPRESS") is a corporation organized under the laws of the State of Georgia, with its principal place of business in Raeford, North Carolina. TWINWOLF EXPRESS is a commercial motor carrier bearing USDOT number 3346117 and at the time of the collision that is the subject of this litigation was authorized to transport goods and property in interstate commerce. Upon information and belief, the TWINWOLF EXPRESS' member is a resident of the State of Georgia.

4. Upon information and belief, Defendant Brandon A. Darius ("DARIUS") is a resident of the State of Virginia.

5. The wreck that is subject of this Complaint occurred in or near Lexington County, South Carolina on or around June 29, 2021 early in the morning.

6. The United States District Court for the District of South Carolina possess jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.00.

7. Venue is appropriate in the Columbia Division pursuant to 28 U.S.C. § 1391 and Local Civil Rule 3.01 DSC because a substantial part of the events or omissions give rise to the claim occurred within the Columbia Division of the District of South Carolina.

8. On June 29, 2021, the Defendant DARIUS was asleep in his cab in a commercial motor vehicle while parked on Interstate 20 East (referred to as "I-20") in or near Lexington County, South Carolina.

9. Defendant DARIUS was partially parked on the white line and rumble strips on I-20.

10. Upon information and belief, Defendant DARIUS was in his cab sleeping on the side I-20.

11. Defendant DARIUS did not have hazard lights on, safety cones position, flares lit, or any other type of warning devices.

12. Plaintiff was driving on I-20 and rammed into the back of Defendant DARIUS' unlit and illegally parked tractor trailer.

13. After striking Defendant DARIUS' parked tractor trailer, Plaintiff Bear's vehicle shot forward passed the Defendant's driver cab.

14. Immediately after the collision, the Defendant DARIUS started his tractor trailer and drove away.

15. Defendant DARIUS never exited his tractor trailer before driving away.

16. Defendant DARIUS was involved in an accident with an occupied vehicle that resulted in property damage and then he left the scene before authorities arrived.

17. Once the police arrived on the scene, one of the troopers then chased down Defendant DARIUS and was able to locate him further up the street.

18. Upon information and belief, Defendant TWINWOLF EXPRESS is no longer authorized to operate as a motor vehicle carrier.

19. As a result of the collision, Plaintiff Bear suffered the following injuries and damages:

    (a)    Extensive pain, mental anguish, suffering and discomfort;

    (b)    Disability for a period of time;

    (c)    Money spent for medical care and treatment;

    (d)    Future money spent on medical care and treatment;

    (e)    Inability to carry on normal activities;

(f) Permanent injuries and disability;

(g) Emotion trauma and distress;

(h) Loss of enjoyment of life;

(i) Past and future Time and wages lost;

(j) Other damages to be proven at trial.

## FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT DARIUS

20. At all times relevant to this Complaint, Defendant DARIUS was operating a commercial motor vehicle transporting property in interstate commerce.

21. In order to undertake such actions, the Defendant DARIUS is required to have, at a minimum, the knowledge and skills necessary for the safe operation of the commercial motor vehicle.

22. The safe operation of commercial motor vehicles requires specialized knowledge and additional training not necessary for the safe operation of passenger vehicles because:

(a) commercial motor vehicles are heavier than passenger vehicles and take longer to stop, as compared to a passenger car operating at the same pre braking speed;

(b) commercial motor vehicles are heavier and longer than passenger vehicles and take longer to execute turning and lane change maneuvers, and take more room to enter traffic, as compared to passenger vehicles operating at the same pre-tum or lane change speed;

(c) commercial motor vehicles are heavier than passenger vehicles and cause more significant property damage and/or personal injury or death in collisions, as compared to passenger cars operating at the same pre-collision speed and trajectory; and,

(d) commercial motor vehicles pose more of a risk of causing personal injury, death, or property damage in a collision, as compared to a collision involving a passenger vehicle operating at the same-pre-collision speed and trajectory.

23. In order to undertake the safe operation of a commercial motor vehicle, drivers such as the Defendant DARIUS must have knowledge and skills in many areas, including the following:

    (a)    the procedures for safe vehicle operations;

    (b)    the proper procedures for performing basic maneuvers such as turning;

    (c)    the importance of conducting a proper visual search;

    (d)    the importance of proper visual search methods, including seeing ahead

    (e)    and to the sides, and using mirrors;

    (f)    the principles and procedures for proper communications and the hazards of failing to signal properly, failing to have property equipment to signal properly, including signaling intent and communicating presence;

    (g)    the importance of understanding the effects of speed, including speed and visibility and speed and traffic flow; and

    (h)    the procedures and techniques for controlling the space around the vehicle, including the importance of space management, space cushions, space to the sides, and space for traffic gaps.

24. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to make regular checks of their mirrors to be aware of traffic, including for vehicles on either side and to the rear.

25. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to be aware of the size and weight of their vehicles when entering traffic.

26. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that because of slow

acceleration and the large space gap vehicles require, commercial vehicles need a much larger gap to enter traffic than in a passenger car.

27.     In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that acceleration varies with the load, and to allow more room if their vehicle is heavily loaded.

28.     In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that before they start to cross or enter a road, to make sure the vehicle can get all the way across before traffic reaches the vehicle.

29.     The injuries and damages incurred by the Plaintiff Bear were directly and proximately caused by the Defendant DARIUS'S careless, negligent, negligent per se, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars:

(a)     In failing to place appropriate safety measures when parked on the side of the interstate;

(b)     In failing to fully pull over to the side of the road to avoid a collision;

(c)     In failing to be properly visable to other drivers on the road;

(d)     In failing to not pull over and sleep in a safe and appropriate location not on the side of the highway;

(e)     In failing to maintain record hours and be forced to stop driving in an unsafe location;

(f)     In failing to remain at the scene after the collision;

(g)     In failing to check on the well-being of Plaintiff after the collision;

6

(h)   In failing to keep the vehicle/trailer and/or maintain them in proper working condition;

(i)   In failing to keep a proper look out for traffic and vehicles around him;

(j)   In failing to keep a proper lookout;

(k)   In failing to yield as required by law;

(l)   In operating the vehicle safely or in hazardous weather conditions;

(m)   In failing to observe the condition of traffic;

(n)   In operating a commercial motor vehicle when he was not qualified to do so;

(o)   In failing to follow the proper procedures for safe commercial vehicle operations;

(p)   In failing to conduct a proper visual search which would have alerted the Defendant DARIUS to Plaintiff Bear presence, location, and intention;

(q)   In failing to properly communicate his intentions to enter Bear's path of travel;

(r)   In failing to account for his vehicle's effect of visibility and traffic flow;

(s)   In failing to properly control the space around his vehicle, including failing to maintain a proper space cushion, proper space to the sides, or proper space to allow for merging vehicles; and

(t)   In leaving the scene of an accident;

(u)   In failing to conduct a post-accident drug and alcohol screen.

30.   The Defendant DARIUS's careless, negligent, negligent per se, willful, wanton, reckless, and unlawful acts were the direct and proximate cause of the collision and resulting injuries and damages to Plaintiff Bear.

**FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT TWINWOLF EXPRESS**

31.   Plaintiff repeats and realleges paragraphs 1 – 30 as if verbatim.

32. At all times relevant to the allegations contained in this Complaint, the Defendant DARIUS was working in the course and scope of his employment for Defendant TWINWOLF EXPRESS or was otherwise acting as an agent or servant of the TWINWOLF EXPRESS.

33. The Defendant TWINWOLF EXPRESS is liable for the acts and omissions of the Defendant DARIUS under the doctrines of respondeat superior, master/servant, and/or agent/principal.

34. At all times relevant to this Complaint the Defendant DARIUS was operating a commercial motor vehicle in interstate commerce under the USDOT authority granted to TWINWOLF EXPRESS.

35. Defendant TWINWOLF EXPRESS is liable for the acts and omissions of Defendant DARIUS while he was operating under its authority by virtue of the Federal Motor Carrier Safety Regulations.

36. The Plaintiff is informed and believes that she is entitled to judgment against the Defendant TWINWOLF EXPRESS for actual and punitive damages in an appropriate amount.

**FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT TWINWOLF EXPRESS**

37. Plaintiff repeats and realleges as if verbatim paragraphs 1 –36.

38. The Defendant TWINWOLF EXPRESS operates as a commercial motor carrier.

39. In return for the privilege to operate commercial motor vehicles on the public roadways, prospective motor carriers must make certain safety related certifications and verifications.

40. Motor carriers such as Defendant TWINWOLF EXPRESS are required to submit a Form MCS-150 to the Federal Motor Carrier Administration and obtain an USDOT number.

41. Each Form MCS-150 TWINWOLF EXPRESS submitted or will submit contains a Certification Statement whereby TWINWOLF EXPRESS declares under the penalty of perjury that is familiar with the Federal Motor Carrier Safety Regulations and/or Federal Hazardous Materials Regulations.

42. Motor Carriers such as Defendant TWINWOLF EXPRESS are required to submit a Form OP-l to the Federal Motor Carrier Administration in order to gain interstate operating authority.

43. The Form OP-l submitted by Defendant TWINWOLF EXPRESS contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they are subject to the pertinent portions of the U.S. DOT's Federal Motor Carrier Safety Regulations ("FMCSR") at 49 CFR, Chapter 3, Subchapter B (Parts 350-399).

44. The Form OP-l submitted by Defendant TWINWOLF EXPRESS contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they have access to and are familiar with all applicable U.S. DOT regulations relating to the safe operation of commercial vehicles and that they will comply with the regulations.

45. Each Form OP-l submitted by Defendant TWINWOLF EXPRESS contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that, at a minimum, they:.

  (a) Have in place a system and an individual responsible for ensuring overall compliance with the FMCSR;

  (b) Can produce a copy of the FMCSR;

  (c) Have in place a driver safety training/orientation program;

  (d) Are familiar with DOT regulations governing driver qualifications and have in place a system for overseeing driver qualification requirements (49 CFR Parts 391); and,

  (e) Have in place policies and procedures consistent with DOT regulations governing driving and operational safety of motor vehicles.

46. Reasonably safe motor carriers develop and implement policies, practices, and procedures to give effect to the minimum safety standards contained in the Federal Motor Carrier Safety Regulations to reduce or eliminate preventable collisions that may cause injury, death, or property damage on the public roadways.

47. Reasonably safe motor carriers train and educate their drivers regarding the safe operation of commercial motor vehicles.

48. Reasonably safe motor carriers utilize information and training materials from industry associations and third party safety vendors such as J.J. Keller & Associates, Inc., the "Smith System," Pro-Tread, and/or the National Safety Council to train and educate their drivers regarding the safe operation of commercial motor vehicles.

49. The safe operation of commercial motor vehicles includes practices and procedures related to speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness.

50. Reasonably safe motor carriers utilize publicly available government, industry, and trade publications regarding the preventability of highway collisions to design, develop, and implement safety management controls which are designed to reduce collisions involving commercial motor vehicles.

51. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

52. To be qualified to operate a commercial motor vehicle, a driver must have experience and/or training to safely operate the type of vehicle; must be physically qualified; must have a currently valid CDL and must furnish the motor carrier a list of current driving violations.

53. To operate a commercial motor vehicle under TWINWOLF EXPRESS operating authority, the prospective driver is required to complete a written application containing the following information:

(a) the nature and extent of the driver's experience;

(b) a list of all accidents in the previous 3 years;

(c) a list of all violations of motor vehicle laws in the previous 3 years;

(d) a detailed description of any denial, revocation, or suspension of any drivers licenses or permits;

(e) employment information for the previous 3 years; and,

(f) the names of all employers for whom the driver has operated a commercial motor vehicle for the previous 7 years.

54. Before a motor carrier such as Defendant TWINWOLF EXPRESS may allow or permit a driver to operate a commercial motor vehicle under its operating authority, the motor carrier must:

> (a) obtain the driver's motor vehicle record from the applicable state agency for the previous 3 years; and,
>
> (b) investigate the driver's safety performance history with all DOT regulated employers for the previous 3 years;

55. Once a motor carrier such as Defendant TWINWOLF EXPRESS hires a commercial driver, every twelve months thereafter the driver must submit a written list of all traffic violations the driver received in those twelve months.

56. Motor carriers such as TWINWOLF EXPRESS are required to maintain a Driver Qualification File meeting the requirements of 49 CFR § 391.51 for the duration of the driver's employment with the motor carrier plus three years.

57. In addition, drivers employed by, or operating under the authority of, motor carriers such as Defendant TWINWOLF EXPRESS, are required to complete and turn in to their employer trip envelopes at least every 13 days. Such trip envelopes include, but are not limited to, the driver's daily Record of Duty Status logs and pre-trip and post-trip vehicle inspection reports.

58. Drivers' daily logs record how much time each driver spends on duty, on duty not driving, off duty, and in a sleeper birth. Driver logs also require drivers to indicate how many miles they drove during each 24 hour period and their locations at each change of duty status.

59. In addition to the required daily logs and vehicle inspection reports, it is standard in the industry for motor carriers also to collect information from their drivers, such as fuel receipts, entry and departure records, and other supporting documentation that verifies the times that their drivers were at specific locations.

60. In addition to the required daily logs, vehicle inspection reports, and supporting documentation, reasonably safe motor carriers utilize available technology such as GPS tracking systems and in cab communications systems to monitor the safety performance of their drivers.

61. It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documents to audit the safety performance of their drivers.

62. It is also standard in the industry for motor carriers to use any additional information, such as in-cab communications and GPS tracking to audit the safety performance of their drivers.

63. It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documentation to audit the safety performance of their drivers to ensure that their drivers are not violating hour of service rules, to ensure that their drivers do not average speeds in excess of what is safe, and. otherwise verify that the information contained in the driver's logs is accurate and truthful.

64. Auditing drivers' daily logs, vehicle inspection report, supporting documents, in cab communications, and GPS tracking information increases the likelihood that a motor

carrier's drivers are operating their commercial vehicles safely and decreases the risk of a preventable crash.

65. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver is not qualified to do so.

66. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver has a higher than safe average speed.

67. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver operates his vehicle in violation of the hours of service rules.

68. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver is not accurate and truthful in the completion of his logs.

69. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

70. It is standard in the industry for careful motor carriers to regularly check their Safety Measurement System details.

71.     The FMCSA's Safety Measurement System (SMS) provides an assessment of a motor carrier's on-road performance results within seven safety related categories. Motor carriers are scored on a percentile basis as compared to other similar carriers.

72.     It is standard in the industry for motor carriers to regularly monitor their SMS scores and to address any areas of noncompliance before they lead to collisions.

73.     The injuries and damages incurred by the Plaintiff Bear were directly and proximately caused by the Defendant TWINWOLF EXPRESS' careless, negligent, negligent per se, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars by failing to use reasonable care in the:

(a)     failing to design, develop, and implement adequate safety management controls related to speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness;

(b)     failing to train Defendant DARIUS regarding speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness;

(c)     failing to properly monitor and supervise the driving habits of Defendant DARIUS;

(d)     Supervision of its business operations in failing to properly monitor the driving habits and records of its drivers, employees, and/or agents, specifically the Defendant DARIUS;

(e)     Supervision of its drivers, employees, and/or agents, specifically the Defendant DARIUS;

(f)     Instruction of its drivers, employees, and/or agents, specifically the Defendant DARIUS;

(g)     Entrustment of a tractor trailer to its drivers, employees, and/or agents, specifically the Defendant DARIUS;

   (h) Compliance with federal and/or state regulations and industry standards, as referenced in this Complaint and as developed during the discovery in this case;

   (i) Improperly auditing the logs and supporting documentation of its drivers, employees, and/or agents, specifically the Defendant DARIUS;

   (j) Failing to utilize available information and technology to properly monitor its drivers, employees, and/or agents, specifically the Defendant DARIUS for compliance with company polices and/or state and federal regulations;

   (k) In allowing the Defendant DARIUS to operate a commercial motor vehicle despite knowledge of his inability to do so safely;

   (l) In failing to have adequate safety management controls in place to ensure compliance with the required safety fitness standard;

   (m) in failing to budget an appropriate amount of money to design, develop, and implement safety management controls in the areas of speed management, space management, seeing ahead total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness; and,

   (n) In failing to utilize available technology to monitor and audit the safety performance of its driver's including Defendant DARIUS.

  74. The Defendant TWINWOLF EXPRESS' careless, negligent, willful, and wanton, reckless and unlawful acts were the direct and proximate cause of the collision resulting in injuries and damages to Plaintiff Bear.

  **WHEREFORE**, the Plaintiff prays for judgment against the Defendants for actual, consequential, and punitive damages in an appropriate amount to be determined at trial in excess of $75,000.00, the cost of this action and for such other and further relief as the Court may deem just and proper.

Respectfully submitted              /s/ Chase Keibler
                                               Chase C. Keibler, SC Fed Bar No. 12784
                                               Keibler Law Group LLC
                                               PO Box 2867
                                               Irmo, SC 29063
                                               T: +1.803.830.6242
                                               F: +1.803.803.7264
                                               Chase@KeiblerLaw.com
                                               *Attorney for Plaintiff Bear*

October 17, 2023
Columbia, South Carolina